# EXHIBIT 32

Pro Se Lawsuit: Plaintiff Joyce Goodwin

# EEOC Document

## Rebuttal to Methodist Le Bonheur Healthcare Claims

### Acronyms

HF (Humanitarian Fund)

MPB (Memphis Professional Building)

CPE (Clinical Pastoral Education)

MLH (Methodist Le Bonheur Healthcare)

### The Power of One Culture and Values and MLH Equal Employment Opportunity and Diversity

MLH Equal Employment Opportunity and Diversity maybe the company's perception as to all employees are treated equally; however, I am in hopes that the company is not distorted to be in belief that all their chosen employees of leadership exhibit their **Power of One** core values they confess.

I am one and know of others who can give declaration concerning leaders within MLH institution who have not unified with MLH core values. I have witness personally as well as suffered emotionally, and mentally under unethical and inadequate demonstration of leadership within MLH establishment.

### Background Information

It is correct that I started my employment with MLH on November 2, 2015, as a part time Administrative Assistant reporting to Rhonda Gilligan-Gillespie, Director Clinical Pastoral Education department ("CPE") however; it is incorrect that I began a position in the Humanitarian Fund department as an administrative assistant my title has always been a Humanitarian Fund Coordinator in the Humanitarian Fund department (exhibit 1 and 3 email signature dated 10/2018). I also did not begin the coordinator position in 2017. My training started on December 12, 2016, with John Wilcher who was retiring January 6, 2017, and once retired I would be replacing him in the Humanitarian Fund Department as a coordinator (Exhibit 1). John wanted to train me for his position for a month due to multiply duties that needed to be completed to be successful within this position. I worked 20 hours weekly with John Wilcher which presented a fulltime status. I accepted the position as a Humanitarian Fund Coordinator in 2016 and was informed by Niels French, Director, Operations, and International Ministries that my title would be a Humanitarian Fund Coordinator and I would acquire the pay grade for that said title after 90 days of working the position (exhibit 4). The information was giving to Rhonda Gilligan-Gillespie by Mr. French as well. Rhonda also informed me that Mr. French had informed her about the position pay grade increase. Rhonda congratulates me concerning the position stating that she could give herself a pat on the back as well because she hired me and when I look good, she looks good informing me that Mr. French stated I was doing an excellent job in the Humanitarian Fund Department (HF).

I was informed by Rhonda that both leaders agreed on my hours as to how they would be divided giving each position 20 hours weekly. I would address CPE department needs working 4 hours on Monday, 8 hours on Tuesday, and 8 hours on Friday with Rhonda making an exception with Mr. French that it would be okay for me to end my shift with her at 3pm on Fridays to pass out HF checks in Mr. French department. I would always make up the 1 ½ hours taken away from CPE on

Monday's or Thursday's so both departments would have equal 20 hours per week. I did this on my own because I wanted to be fair toward both departments. My schedule with Mr. French 4 hours on Monday, 8 hrs. on Wednesday's and Thursday's and well as coming to the HF office on Friday at 3pm. I had two offices at one point one office was in the Center of Excellent (COE) then CPE moved to the Memphis Professional Building 8th floor (MPB) which was Rhonda's area in the CPE department. The MPB 7th floor was with Niels in the Humanitarian Fund department. After resigning from the CPE department, a couple of months later Mr. French informs me that Dr. Mosley wanted the HF department to be move to the 8th floor in the MPB. I was the only one that had to move to the 8th floor. The 8th floor MPB is where the CPE department was located, and Rhonda Gilligan-Gillespie's office area was on the MPB 8th floor. The same floor Rhonda had tried to ban me from.

I resigned on October 30, 2018, from Rhonda Gilligan-Gillespie (exhibit 3), Director Clinical Pastoral Education department ("CPE") but remained part time in the HF department, with Niels French, Director of Operations, and International Ministries. My resignation was produced due to the toxic working environment of Rhonda Gilligan-Gillespie. I started verbally addressing my concerns with Niels French first. A couple of times speaking with Mr. French concerning my ordeals with Rhonda. Mr. French informs me to go to HR to protect myself so Rhonda would not try to do anything underhanded, so I did (Exhibit 8). I also informed Mr. French that Rhonda stated that she would make sure I would not work for MLH. Mr. French revealing to me an incident as to why he felt that I should go to HR. Mr. French went on to say that my pay increase had not been done due to Rhonda. Mr. French adds Rhonda felt he was trying to take control and take me away from her department and she was not going to sign anything because Mr. French and I were planning something behind her back. Niels stated this was said by Rhonda in a leader's meeting with her being in rage stating Mr. French did not inform her that I was going to be Humanitarian Fund coordinator. Mr. French stated he was unsure why Rhonda would say that when they had addressed all details together. Mr. French stated he believed Rhonda was sick (mentally) due to how she would repeat doing these outcries of rage on various occasions (meetings, etc.). I agreed with Mr. French about the sickness because I already knew about Rhonda's mental health. She revealed it to me when asking for my help with her leadership duties, I agreed at the time to help with her task because I felt sorry for her. Rhonda also stated she was not ready to retire. She wanted to reach a certain amount of money to take care of herself and if MLH knew about her mental health, they might make her retire. Days later she gave me her passwords to log in on her computer and another software password used by leaders to do payroll. At the Current time I did not know Rhonda was speaking about helping her by gaining her password; however, I also was in belief then that it was not a security breach if Rhonda was giving her password to me. I did ask Rhonda about Mr. French statement concerning my pay increase and her reply was the same information as to what Mr. French had stated that Mr. French and I were trying do something behind her back. Rhonda also stated that Mrs. Ruthie (COE Admin. Black) had been with MLH for years and she has not given her a higher pay grade title.

My attempts to gain resolution with HR concerning my ordeals in Rhonda's toxic working environment failed. I had spoken with Niels French and Linda Hays (HR) on various occasions about my distress. My last attempt was to go to Dr. Mosley. I reached out to Dr. Albert Mosley (VP Rhonda's boss- Exhibit 7), weeks passed, and Dr. Mosley did not reply to my email. I did discuss this with Linda Hayes, and she informs me that Niels had started avoiding her as well. Linda wanted to bring Niels in so he could validate things he discussed with her in front of Rhonda with all of us in a meeting (Linda, Rhonda, Niels, and me). I knew she was speaking truth due to one day she called me in the HF department and ask had Niels been out of the office. I reply no, then she asks

me if Niels was in his office now? I replied yes, Linda states I am going to call him now. Linda Hayes calls, Mr. French, I hear Niels phone ringing, but he is not picking up. Linda calls me back and ask why Niels would be avoiding her. My reply was Niels knows how Rhonda is and I believe he did not want to be in a battle with her. I ran into Dr. Mosley a month later (from the date I emailed him), at a CPE event and he acknowledge that he received my email and would get back with me, that day of getting back with me never happen. With no feedback being made or spoke of that could show me acknowledgement of my confessions and cries for help being taking seriously, I knew my only choice were to resign under Rhonda's leadership. My health was also deteriorating from the toxic environment. I felt burden down wondering why no one would come to my rescue. I felt useless while subjected to continue to work in this toxic environment under Rhonda's leadership. I was put on FMLA with my medical doctor and my counselor due to all the stress, anxiety, and panic attacks (Exhibit 5 and 6) therefore I felt I did not have a choice but to resign from under Rhonda Gilligan-Gillespie leadership (Exhibit 3).

I picked up additional hours in the Medical Education department due to desperately needing 40 hours weekly in which I would have never resign from a part time position to go to another part time position that would equal same pay and benefits. After resigning from Rhonda Dr. Mosley did reach out to me but not about my email sent to him in September 2018. I had informed HR Linda Hayes that Rhonda was trying to ban me from the 8th floor this information was given to me by Niels French, and I am unsure how it got to Dr. Mosley however he calls to inform me that I could go on the 8th floor when I wanted to and after my two-weeks with Rhonda had ended give her the key to the office. Also adding for me to do my two weeks on the 7th floor in the HF department instead of working with Rhonda, this was due to Rhonda saying she did not want me to give her two weeks. Dr. Mosley also stated if I needed to go on the 8th floor after my two weeks were up I could because Rhonda cannot ban me from the 8th floor. Dr. Mosley did not ask any questions as to why I resigned or about the email requesting to speak with him. I did not get too many words into the conversation, however; I did acknowledge I wanted to speak with him about Rhonda's behavior when I emailed him. He avoided my words letting me know he had to run to a meeting. I always knew the CPE department was more valuable to keep then listening to my cries and Dr. Mosley did not want me to know he was choosing the CPE department which represented Rhonda because she was the director of the department. Rhonda had already express to me multiply times that she was tarnishing my character with lies to Dr. Mosley and others in an effort that the other leaders would not like me.

The Humanitarian Fund Coordinator title has never been modified for me. (Exhibit 3-email signature 2018). I have always been under the coordinator title since I began the Humanitarian Fund position on December 12, 2016. I just did not receive the pay grade in 2017, 2018, and a portion of 2019 which was promised after 90 days of working the position (Exhibit 4), but I was compelled to display the title for the position and do all task that came along with the position title. In January 2019 I was informed by Niels French he would change my title to Humanitarian Fund **Program** Coordinator (Exhibit 11) to recoup the monies I never received working as a Humanitarian Fund coordinator in 2017 and 2018, and he was trying to give me an increase that would be compatible with the status of a director's pay since the Humanitarian Fund policy deemed that the Chairperson should be a director (exhibit 10 4th pg.). After John Wilcher retired in 2016, I became the chairperson for the committee meetings. The promotion **should not** have been a Humanitarian Fund **Coordinator**. I was already working under that title therefore it baffles me for MLH to state the position of a HF coordinator became open or available in 2019. I was promised a title of a Humanitarian Fund **Program** Coordinator (Exhibit 11) in 2019. The promotional title of Humanitarian Fund **Program** Coordinator was promised by Mr. French he changed the title to

Humanitarian Fund **Coordinator** without my knowledge of the change, finding out once all was finalized. Again, another promised pay grade increase that I did not receive in the period that it was promised. But instead making it seem as if I was promoted to Humanitarian Fund Coordinator from the title of an administrative assistant in which I never used or was addressed for the title of an Administrative Asst. in the Humanitarian Fund Department. MLH (Niels French) only used the title of Administrative assistance when it came to my pay (Exhibit 12) again, I had to express my title as a Humanitarian Fund Coordination in my email signature and to all employees, clients, landlords, etc.

### My Complaint of Racial Discrimination/Harassment

MLH wrote that my allegations between December 2019 and January 7, 2020, reporting inappropriate comments, harassment, and discrimination based on my race did not happen. I started reporting the toxic behavior of Rhonda Gilligan-Gillespie around and about June 2018 and continued into 2019 and entered January 2020. I sent Niels French and cc Linda Hayes in an email before I resigned from the CPE department to express my disappointment as to how nothing was resolved concerning my admissions of harassment, unethical provisions, and my character reduced, in a toxic working environment (exhibit 2). I wanted my complaints to go on record (exhibit 8). I had already spoken with the HR director off record and requested to be on record that is how Linda Hayes enter the picture (exhibit 9).

Ms. Gilligan-Gillespie or Niels French holding me accountable for my work ethics and character? MLH leaders should be held accountable for their work ethics and deceitful character. All my performance evaluations were over exceeding every year under Rhonda Gilligan-Gillespie leadership as well as Neil French leadership (exhibit 11, 12, 13). I received a High Five Award (Exhibit 15) from some of the corporate office staff within months of receiving the Humanitarian Fund Coordinator position. I continued to receive outstanding reports and High five rewards which is confirmed in my elevations by Niels French and Rhonda Gillian-Gillespie (Exhibit 12, 13, 14,). I held Rhonda accountable for her actions and she validates this within my last evaluation (Exhibit 12). My evaluation Mr. French and Ms. Rhonda shows within their writing in my evaluation as to how my character, personality, and integrity were with them. How do I get to a place where I am now unorganized, do not have any integrity and need guidance? Somewhere something had to happen, the question becomes did I change or is MLH leaders making false claims.

Rhonda was trying to blame me for her incompetent, and unethical poor working style always late on reports, turning in evaluations late, not prepared for her CPE class, etc. Rhonda would always acknowledge that I had to be in the office to be 'her eyes and ears. (Exhibit 20) shows one of her late evaluations. Rhonda would state that she did not have to come to the office because she can work from home. Which was untrue. We communicated via text, email, and cell phone calls at least two to three weeks monthly due to her absence from work. Rhonda Computer never worked at home therefore those said task that she needed to do would not be completed or touched, bringing her leadership work for me to finish.

When Dr. Mosley arrived at MLH in 2018 Rhonda informs Dr. Mosley that I was the one updating the CPE handbook. Rhonda has always had one of the CPE students and at one point a PRN Chaplin to assist her with updating information into the Clinical Pastoral Education (CPE) handbook. Dr. Mosley started requesting for her to give various updates about the CPE department to review. Rhonda informed me that she felt Dr Mosley was more demanding than the last VP therefore Rhonda requested for me to play along with her as if I were updating the CPE handbook so Dr. Mosley would not think it was her updating the CPE handbook. I did not agree to take the

blame for the handbook not being updated correctly, therefore she begun the brutal attempts of trying to make it look as if I am the one who was incompetent and unorganized. Rhonda would email me about a task stating she informed me several times to complete the task. She did these types of email statements so much I started Blind copying others in my emails to her. I had spoken to her about her brutal attacks with trying to paint me as someone that was unorganized and did not fulfill my task duties (exhibit 16, 17, 18) Rhonda wanted me to be available to her Monday- Friday working me as a full time in her department. If MLH pull my working hours in 2017 up until 2018, they will find out that I did indeed work overtime constantly. Rhonda also informs me she was telling Dr. Mosley and others lies about me so they would not like me. Stating she would also cry so they would feel sorry for her. This is the same way she had informed me she had done with other black students however at the time I did not know this was her manipulated way of getting her way. Rhonda did not allow me to know anything about the CPE handbook polices and did not want me to gain any type of relationship with the students informing me she did not want me in any clicks, and she did not have time to teach me about CPE policies. My only job dealing with the CPE handbooks were to print them out and to make a book for new students starting the CPE class as well as making sure the page contents were in correct order (exhibit 16, 17).

Methodist did not address any areas to make changes for me. I did not request for both leaders to sign my performance evaluations that was already in place for three signatures to be presented (Exhibit 20 email 2017). Also, my working time hours and days where already communicated and designated since the beginning of working two part time positions.

I have never stated I "felt threatened" by my supervisor. Mr. French would constantly state that I would receive a pay increase in 2016, 2017 and 2018 for the HF coordinator position and it never happen. In 2019 he finally he did a pay increase in May 2019 however it was not the pay increase or title he promised me. Mr. French informed me in January 2019 that he would change my title to HF program Coordinator (exhibit, 11). When speaking with HR Christina Morgan in 2019 about my pay she ask Niels about it and her words to me where not the "pay was appropriate". But "maybe Niels was intending to, and something may have happened". After going to Christina with my concerns Niels tells me "I am trying to get him in trouble". I ask him how can I get him in trouble if he is doing the correct thing?

In 2017 and 2018, and 2019 my email signature acknowledged the title of HF coordinator, the committee members, applicants, co-workers, clients, landlords, etc. all address me as such. I was performing all duties for the position as a Humanitarian Fund Coordinator and a Committee chairperson (Director -Exhibit 10 page 4) without the pay grade. In January 2019 Mr. French promise to change my title to a HF **Program** Coordinator and stated my page grade would be higher than a HF **coordinator.** This was to recoup back monies from 2017, 2018 and 2019 that I did not receive as a coordinator also to start paying me monies that would equal to a director because the HF policy deem the chairperson should be a director. (Exhibit 10 page 4). Since day one of accepting the position as a Humanitarian Fund coordinator and the chairperson for the committee meeting Mr. French words were never trustworthy on following through with his promises concerning my pay grade. My reason to question Mr. French constantly about my pay was not because I thought I should receive more money it was because I knew my position as a HF coordinator and a chairperson for the committee meeting was a higher-grade pay.

I specified working in a "hostile work environment" in the Humanitarian Fund department in 2019 because everything I said or did Lori Dale in HF finance always had something negative to say about it and this had never happened to me before in the HF department while working in this position

(2016-2018). In connection with my question regarding the financial budget in the Humanitarian fund department (Exhibit 21) I am the overseer who did the financial and payroll reports to submit to payroll and the finance department. I was the chairperson who met with the committee members to oversee the committee meetings. I am the one who kept up with the grant budget for the HF department. Lori Dale is the person who spoke about me going over the budget and the same person who contact Niels to inform him I was asking about the HF budget when no said budget had ever been given to me concerning the HF grants since I started the position. Mr. French was out of town at the time the budget amount came up therefore being that I oversee all aspects of the transmission of Humanitarian grant Funds budget I wanted to know if I was doing something incorrectly. I never knew I was limited as to who I could direct my questions too, it had never been said to me by anyone in the past that I was restricted from higher pay grade leaders. Also communicating with committee members weekly and sometimes daily as the chairperson the members titles where all higher grades pay from directors to managers, therefore is MLH stating it was okay for me to speak with only particular leaders about Humanitarian fund? I did not have a stipulation as to which leaders I could direct my questions too in the pass. As I wrote earlier everything I said or did starting in 2019 Lori Dale would find something wrong with it. I was the Humanitarian Fund Coordinator therefore what level did I need to be on to ask any leader a question about the fund? I was doing duties of a director as the chairperson according to the HF policy ((Exhibit 10) and doing all said duties of a coordinator and chairperson for over 2 years (without the pay) therefore I am not certain what level I needed to be on to speak with any leader. The description of a Humanitarian Fund Coordinator designates for me to be an overseer and decision maker (Exhibit 21). Mr. French was contact by Lori Dale in finance department, the same person who states that I am going over the budget but had issues with me asking a director and cc an Interim VP about the budget.

Mr. French declaration that he informs me 'this was something I should not be concern with". The words I recall Mr. French saying was "I am making trouble" this was his words for everything, making trouble for him and everybody else when I am asking a question about duties I oversee. I ask Mr. French what trouble I was making, asking a question concerning my job, he did not reply. If you were to break down Lori Dale HF budget in (exhibit 21) it shows what my salary should have started with ($42,000) in the HF department in 2017. It appears Lori Dale did not know I was not receiving that amount because she would not have expressed my salary was included in the HF budget within the email. (Lori is the person who allocated my salary into Niels budget account so that Niels can pay me however Niels was not paying me the $42,000 salary. Who was it going to I don't know? I knew Rhonda was the person that was blocking my pay grade increase in 2017 and 2018 but once I resigned from Rhonda, I addressed my pay to Mr. French again due to Rhonda could not block my pay grade anymore. Although I was receiving the salary of $42,000 in 2017 and 2018 it was only due to being subject to work for Rhonda every day (Exhibit 18).


MLH writes "there were never any prior complaints of racial discrimination, and I am not able to point to any comments or others who were treated differently". Now that is a bold statement for MLH to make when they do not know who I can point too. I do not recall stating to anyone that someone else made a complaint perhaps they did not due to not wanting to be black ball or look upon as a troublemaker. I am in hopes MLH is not in belief that they do not have unethical leaders working in their establishment. For MLH to write I was "simply chaffed" due to being provided appropriate guidance by both of my prior supervisors and always felt I should be receiving more money" Again MLH shut me down as if they know their leaders are speaking truth. My evaluations speak for itself. How is it that both leaders are providing appropriate guidance when they have never stated on my evaluations or any type of verbal or written warning that I am in need for guidance

with anything. I do not feel that I should have received more money, I know I should have received more money. I can tell MLH has not did any research only going by what their leaders speak of. MLH need to investigate before making their claims as to who I do not know or what their leaders have not done.

**Th alleged credible Evidence MLH presents**

In November of 2019, as to what I was told an employee of Morrison reported that I had cancelled her check however the Morrison employee requested for the check to be cancelled. I had given the check to her husband, and she did not want her husband to have the check. I gave the check to the husband (also a Morrison employee) because he came to pick the check up for his wife due to her being admitted into the hospital the same day the checks were ready. The husband informs me that he did not know when his wife would be released and since this was a rare occasion, I made a judgement call in which I was able to do within my position. Relatives and friends could pick up checks for applicants, plus the Morrison wife and husband had come together to complete a prior application for a lost of wages for the husband therefore I never felt it was a problem to give the check to the husband. The same day the husband picks the check up later that afternoon I called to check on the wife in the hospital at Methodist and she express to me that her husband did not tell her he had the check, and she did not want her husband to have the check. The wife also expressed to me to ask the husband for the check back when he get to her hospital room and not to tell him she had request for me to do so. She went on to say it was things about her husband she wanted to tell me once she gets out of the hospital and then I can reissue the check to her. Once the husband arrived at the hospital room, I spoke with the husband to ask him to bring the check back to me, the husband agreed (text msg exhibit 24). I also express this to MLH Tina Sims and Daryll Arbors and gave the text messages and pics the husband had sent me, informing them the husband had made a pass at me and the husband informed me he did not like that I rejected him. (Exhibit 23). Daryl Arbors and Tina Sims audit my files and did not find any other allegations of me requesting monies from an applicant. Daryll Arbors and Tina Sims states some applicant's confessed doing fraudulent actions to their supporting documents. I only verified applicants if they do not submit supporting document(s) when this would happen the applicant would give a number for me to call their landlord, auto shop, etc., if that person verified what the applicant is stating was truth that is the only investigations I do because the burden was on the applicant to be truthful not for me to investigate if they are telling the truth. My HF position did not dictate for me to authenticate documents presented to me therefore if an applicant had a police report that was sufficient for their supporting document. Daryll and Tina evident of them auditing my files did not show that I did anything fraudulent, it was the applicant who falsified their document and again it is the applicant burden to be truthful not for me to investigate every supporting document and applicant give to me. MLH calls mismanaging my files when an applicant admits to fraudulent actions that I do not know about? MLH did not find any other applicants claims that I had ask for some of their grant funds. Lastly, no evidence of the Morrison employee applicant claims, of me requesting for a portion of their grant funds.

On or around Nov. 5, 2019(exhibit 23) The Morrison's employee husband contacts me via office phone concerning his personal need for help to move out of his current resident with his wife as well as help concerning a need for him and his wife damage to their home. When the husband called, I was preparing to leave for the day, and he informs me it was a life-or-death situation therefore I inform him that I would call him once I picked up my cousin. When I returned the husband call the husband tells me that his wife is trying to kill him (very emotional) after I get him calm down, he states he needs a wife like me from there the advancements starts and the husband continuing calls and sending text messages and inappropriate pics (Exhibit 23). I did deflate his

advancements and he grew angry stating he was a man, and I was a woman therefore I should know my place. I informed the husband to contact my boss if he needs personal HF assistant. I am not sure how this concocted story came about with me asking for grant money, but I do feel speaking with the Morrison wife in the hospital her toned at this time sound of fear and anxiety and the way her husband spoke to me when I rejected his advancements was controlling and angry from me rejecting him. When asking a Chaplain (Tina Sims terminated the chaplain as well) to check on the wife weeks later. The chaplain gave statements to Tina Sims and Daryll Arbors as to why I ask her to check on the wife and what a co-worker had stated about the wife, that she could not make a move without her husband. The termination of the Chaplain Tina Sims did trickery calling the Chaplain handyman and asking him if he did masonry work as if she needed some work done the handyman states he did not do that kind of work, but Tina never asks the handyman if he did the work for the Chaplain, so she terminates the Chaplain as if she lied about her work being done. The Chaplain recorded the session with Daryll, and Tina and it is present that the Chaplain informs them that her handyman did not do this type of work for everybody. The Handyman did not do the work for everybody because he did not have the license to do masonry work. HF applicants did not have to have license worker to do home task they can choose who they wanted to do repairs in their home therefore I am not sure why Tina didn't ask the handyman if he did the repairs for the Chaplain perhaps because she wanted to make it appear as if the Chaplain did fraudulent actions clearing the way of any acknowledgment of truth that I stated about checking on the wife weeks later due to the wife stating she would get back with me to redo the check once she get out of the hospital. My request for the Chaplain to check on the wife was because she had not gotten back with me, and I wanted to make sure she was okay because of her tone in the hospital speaking about her husband.

Normally, if a HF applicant makes a compliant Niels would come to me and ask me about it as well as a voided check complaint but this time, he did not come to me about the Morrison employee complaint. I know Niels did not want me to be terminated he liked my work. I write this due to Niels calling me a couple of weeks later after I was terminated. I ask him why he let them (Daryll and Tina) terminate me and his reply was it got out of his control. Niels also offered to help me with my bills (financially) and stated he has no ill feeling toward me (recorded session I have). At the Appeal hearing Daryll Arbors claims Niels French was the one to bring the information about the voided check complaint to them. Hence, Niels is under the same leadership as Rhonda which Dr. Mosley is their boss this was Niels out since the department was on him to let me go due to reporting Rhonda to HR. When I resign from Rhonda in October 2018 Dr. Mosley inform Niels, he would allow me to work until December 2018. After I gave the complaint about Rhonda trying to ban me from the 8th floor Dr. Mosley inform me, I could stay as long as I wanted too, perhaps that was because he didn't want me to seek legal assistant but along this time I was already searching for an attorney and finally gain one a couple of months before MLH terminated me. I did confess to my attorney about the harassment, racism, and the negative treatment from Rhonda and that I reported it to HR, but nothing was done, and I started feeling unwanted in the HF department as if Dr. Mosley did not want me there. I write those words because he really wanted me to leave two months later after I resigned from Rhonda. Also, leaders would inform me that they had asked Dr. Mosley if I could work with them to gain extra hours due to losing hours working with Rhonda. The leaders would tell me that Dr. Mosley would tell them the funds were not in their budget however the leaders would be baffled as to why Dr. Mosley would make that statement when they had the funds in their budget. It was other signals I was told by Niels as to statements Dr. Mosley would say to him when trying to get an approval for me to gain extra hours in the HF department. Dr. Mosley said I should not be receiving my salary pulling from the HF budgets therefore he did not want to give me extra hours. I had nothing to do with the process as to how I was receiving my pay therefore I am uncertain as to why Dr. Mosley held on to that reason not to give me extra hours. I

did believe some of the reason Dr. Mosley did not want me at MLH was due to Rhonda painting a negative picture of my character and work ethics. I never knew Dr. Mosley personally for him to have an opinion about me, so anything he thought he knew about me was hearsay. I did approach him a month later when he first arrived to MLH but only to introduce myself. I did not really care if I knew him personally, but I did feel badly that he never ask why I resigned from Rhonda or why I email him concerning my working conditions, at least to make me think he was concerned.

At the Unemployment Appeal Hearing no evident were found with me breaking any policies or misconduct which granted my employment benefits (exhibit 19). Perhaps some of the decision was due to Daryll Arbors stating false testimonies under oath stating that I had admitted to him that I did fraudulent behavior when nothing on my recorded session with him and Tina put me in a statement of blame. Also, it could perhaps be due to MLH giving false information to the TN Department of Labor and workforce that I was terminate on December 5, 2019, (exhibit 25) instead of the correct date of January 8, 2020 (exhibit 26). The incorrect termination date given to the unemployment office may have derived from an interview scheduled for a candidate to meet with Niels French to interview about a Humanitarian fund position on December 4, 2019 (exhibit 27) when I am still working with MLH.in the HF department and the only employee therefore Niels was interviewing someone for my job on December 4, 2019, and to cover it up they inform the unemployment office I was terminated on December 5, 2019

November 19, 2020, I cited two different reasons due to the applicant stating two different reasons. I sent an email on December 10, 2019, to Tina Sims and Daryll Arbors to give clarity as to why two reasons where given. (Exhibit 28)

I do not recall writing the reason on the Morrison's employee application that I could not find supporting documents as MLH presents. However, the applicant did state she would have to ask for another copy of the statement from the person doing the work to her home because she misplaced her copy therefore, she would bring the statement in when she pick up the check. However, on the check pick up day she was admitted into the hospital. When MLH was going through my files I am not confident that MLH did not falsified any of my file documents due to it has been revealed more than once that they reduce themselves with fabrications (termination date to the unemployment office and Daryll Arbors lies at the unemployment Appeal Tribunal hearing) My position gave me full authority to deem decisions if I felt they were a justified cause. The applicant was in the hospital, and that I was told it was a serious matter. I made the judgement call to give the check to the husband. I wanted this need to be taken care of so that the applicant would be concentrating on getting well not the damage to her home. If an applicant has stated that they will bring supporting documents on or before check day, the check requisition would always be submitted in an effort so the applicant would not have to wait another week for their check. If an applicant did not bring documents on or before the check day, they did not receive the check until the documents were present but again, I stress there were sometimes reasons I could deem to deviate if that said reason were in a gray area and I felt the Morrison applicant circumstances was in a gray area.

The applicant may have informed MLH that the check had not been lost or the information was never reported to me about a lost or stolen check; however, I informed MLH that the applicant did indeed inform me that her husband would say the check is lost and later the applicant did state her husband said the check was stolen.

I informed MLH what the applicant's husband text to me giving MLH evident of the husband text messages of advancements and the husband texting that he would give the check back to me, and a statement from the Chaplain giving information of my request to check on the Morrison applicant due to the applicant tone and words when speaking with me in the hospital as if she was under

distress. Plus, the chaplain statement to MLH as to what the applicant's co-worker revealed about the applicant was fearful of her husband. MLH never considered my statements, supported documents or my witness statements. Another witness of mines (interim Chaplain) spoke with MLH giving a verbal statement that she was in the office with me when the applicant's husband picked up the check and I never walk out of my office with the applicant's husband as the allegations that the applicant reported to Tina and Daryll that I requested for the monies from her husband first walking out in the hallway with him (exhibit 29). A matter of fact I did not say to many words to the applicant's husband at this point of him picking up the check due to his advancement days earlier. My only words to the husband were requesting his signature for the check. Also, If the check is voided November 19, 2019, and the applicant states I informed her husband about receiving monies from their grant first, then informing the applicant later the same day to let her know that I was voiding the check due to them not giving me some funds from their HF grant check. Why would the applicant cash a void check and wait to give information to MLH about me asking for funds a couple weeks later in December 2019 when the applicant states to MLH all this was done in November 2019. Revealing this information to MLH only after they find out the funds of the voided check that the applicant cashed were pulled from the applicant's bank account., if the funds had not been pulled out of the applicant's account makes me wonder if the applicant would have given MLH false information that I requested monies from their grant check? Why would the applicant wait two weeks later to do a complaint with MLH about me requesting for funds? One would believe such information would have been given much sooner to MLH like the day it happens. Also, the Morrison applicant states in her statement given to the appeal hearing (exhibit 29) that I came to the cafeteria and spoke with her husband on October 10, 2019, and the application was giving back to me on Wednesday which would have been October 16, 2019, and they could pick the check up on Monday which would have been October 21, 2019. These dates are in October 2019 not in November 2019. The applicant completed her application in November 2019 **not** October 2019. The husband text messages I submitted to Tina and Daryll were sent in November 2019 (exhibit 24) so why do the wife write a statement revealing that all was done in October 2019(Exhibit 29)?

**Response to Charge**

MLH writes that I "accepted and paid out multiple Humanitarian Fund applications without the supporting documents" which is fabricated. The 6 applications that Daryll and Tina laid before me they did have their supporting documents. Daryll and Tina stated that two admitted to giving me a number to contact a relative or friend to verify their rent. Two falsify their police report. The 5th applicant was the Chaplain, and Daryll Arbors and Tina Sims had a copy of her supporting documents in which I wrote earlier Tina called the Chaplain's handyman never asking if he worked on her damage to her home, but Tina lied, faking as if she needed some masonry work done to her home. Lastly the 6th applicant was the Morrison applicant who gave no proof of me requesting funds from her, yet Tina Sims proclaims on my termination letter I did inappropriate behavior. Let me add Tina Sims and Daryll Arbors only submitted one application to the unemployment appeal hearing, the Morrison applicant. One would think if my files were mismanaged, and I didn't collect supporting document from other applicants looks as if they would have submitted all 6 of the applications, they proclaim was mismanaged to the appeal hearing. They only submitted one application and a written statement from the Morrison applicant whose statement was not signed. (Exhibit 29)

MLH statement that I was in "a position of trust and abused that role for attempted personal financial gain, violating her coworkers and those who turn to the Humanitarian Fund for support".

That is interesting that MLH would write this statement when I am not the one who abused the HF funds.

The November month is where Tina and Daryll were auditing my reports and pulling from my files it is puzzling why they did not ask me about any other voided checks especially the check I had void with a payment for a deceased employee cobra payment for two months. This voided check was in the same November report as the Morrison applicant voided check. One would think that this voided check would have jump out at them since the HF department did not pay Cobra bills and especially not for a deceased employee (exhibit 30). Two months of Cobra payments for a deceased employee would be abusive to the funds because the HF department did not have a grant that paid Cobra bills especially when the employee is deceased, but since the cobra payment was request by Christina Morgan HR and she is a MLH leader they don't say anything about this void check. The MLH leaders would abusive the funds continually. I did mention this to Tina Sims in my session with her about the cobra void check as to why she didn't ask me about the voided cobra check in November, and she did not respond. The bereavement grant is only to help with the burial or headstone not to pay for Cobra payments. I would think that would be fraudulent and untrustworthy actions (The types of grants the HF dept. have been listed in the policy Exhibit 10)

Lastly, I did want to complete MLH Corporate Compliance Questionnaire because I do have evidence of a couple of fraudulent things MLH leaders have done however, my first Attorney gave me advice that she would not, due to MLH has never listen to any of my concerns before when I was there so why did I believe that MLH would start listening now, when they have terminated me. And I felt she was correct, so I took her advice and didn't complete their questionnaire.

(Exhibit 31 shows that I was the Chairperson)

Joyce Goodwin